UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JOHNNY STRICKLAND,

       Plaintiff,

v.                                       Case No.:

CITY OF DETROIT,
DETROIT POLICE DEPARTMENT,
JAMES CRAIG, MARK BLISS, RODNEY
BALLINGER, STEVEN MURDOCK,
CASEY SCHIMECK, DEANNA WILSON,
and JOHN DOES 1 through 20,

       Defendants.

_____/

| | |
|---|---|
| Mark P. Fancher (P56223) | Leonard Mungo (P43562) |
| Michael J. Steinberg (P43085) | Cooperating Attorney, |
| American Civil Liberties Union | American Civil Liberties Union |
|   Fund of Michigan |   Fund of Michigan |
| 2966 Woodward Ave. | The Mungo Law Firm, PLC |
| Detroit, MI 48201 | 333 W. Fort Street, suite 1500 |
| (313) 578-6822 | Detroit, MI 48226 |
| mfancher@aclumich.org | (313) 963-0407 |
| | Mungol16@msn.com |

Attorneys for Plaintiff

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

1.    Plaintiff Johnny Strickland, an African American police officer and

11-year veteran of the Detroit Police Department, brings this action for relief from

a racially hostile work environment and violation of his civil and constitutional rights under state and federal law.  The Detroit Police Department is a workplace where white supervisory officers discriminate against African American subordinates and then retaliate against those who complain. In 2017, a special investigation by the police department's internal Committee on Race and Equality (CORE) issued a devastating report documenting widespread racial discrimination within the department.  But Detroit's Chief of Police, Defendant James Craig, rejected the report and suspended the work of the committee. As a result, racial discrimination within the police force persisted unabated, leading to a humiliating and dangerous altercation in which Officer Strickland was detained, harassed and humiliated by a group of white police officers -- his own colleagues on the force -- without cause or justification. When Officer Strickland complained, he was targeted for retaliation.

2. Consequently, Officer Strickland asserts claims principally for violations of Title VII of the Civil Rights Act of 1964 and the Fourth and Fourteenth Amendments to the United States Constitution as enforceable through 42 U.S.C. § 1983. Officer Strickland's employer is liable for the acts of individual officers because its failure to train, supervise and discipline them caused the violation of his civil rights. Strickland has also suffered discrimination in violation of 42 U.S.C. § 1981 and Michigan's Elliott Larsen Civil Rights Act, MCL

37.2202. He seeks injunctive and declaratory relief, damages, and reasonable attorneys' fees and costs.

## THE PARTIES

3. Plaintiff Johnny Strickland ("Plaintiff") is an African American male who has been employed as a police officer by the City of Detroit for nearly 12 years.

4. Defendant City of Detroit ("Defendant COD") is a municipal corporation, organized under the laws of the State of Michigan, which is sued because of the acts and omissions of the police department it maintains as a department or division of the City of Detroit.

5. Defendant Detroit Police Department ("Defendant DPD") is Defendant COD's primary law enforcement agency, and it is a division of Defendant COD. All of the events alleged herein occurred while Plaintiff was employed by Defendant COD in Detroit, and at all relevant times Defendant COD has been an "employer" of Plaintiff within the meaning of Title VII, 42 U.S.C. § 2000e(b). More particularly, Plaintiff's employment assignment by Defendant COD has been with the Detroit Police Department, which, as a department of Defendant COD has been responsible for direct supervision and other administration of Plaintiff's employment.

6. Defendant James Craig ("Defendant Craig") is the Chief of Police for the City of Detroit. He has supervisory authority over all police department personnel

3

and is a final policymaker with regard to law enforcement. At all relevant times he acted under color of state law within the meaning of 42 U.S.C. § 1983. He is sued in both his official and individual capacities.

7.     Defendant Captain Mark Bliss ("Defendant Bliss") is an employee of the City of Detroit and its police department and he is vested with supervisory authority.  At all relevant times he acted under color of state law, within the meaning of 42 U.S.C. § 1983, and he is sued in his individual capacity.

8.     Defendant Sergeant Rodney Ballinger ("Defendant Ballinger") is an employee of the City of Detroit and its police department and he is vested with supervisory authority.  At all relevant times he acted under color of state law, within the meaning of 42 U.S.C. § 1983, and he is sued in his individual capacity.

9.     Defendant Steven Murdock ("Defendant Murdock") is an employee of the City of Detroit and its police department and he is assigned to the agency's K-9 unit.  At all relevant times he acted under color of state law, within the meaning of 42 U.S.C. § 1983, and he is sued in his individual capacity.

10.     Defendant Casey Schimeck ("Defendant Schimeck") is an employee of the City of Detroit and its police department.  At all relevant times she acted under color of state law, within the meaning of 42 U.S.C. § 1983, and she is sued in her individual capacity.

11.     Defendant Deanna Wilson ("Defendant Wilson") is an employee of the

4

City of Detroit and its police department, and she is assigned to the department's internal affairs unit. At all relevant times she acted under color of state law, within the meaning of 42 U.S.C. § 1983, and she is sued in her official and individual capacities.

12.     Defendants John Does 1 through 20 are employees of the City of Detroit. At all relevant times they acted under color of state law, within the meaning of 42 U.S.C. §1983, and they are sued in their official and/or individual capacities. Their true names are currently unknown to Plaintiff, and Plaintiff intends to amend this Complaint to name them individually as soon as their identities are disclosed.

13.     At all times relevant herein, Defendant COD/DPD had at least fifteen employees, and was therefore an "employer" within the meaning of Title VII, 42 U.S.C. §2000e(b).

14.     Defendant COD/DPD was also an "employer" within the meaning of the Michigan Elliott Larsen Civil Rights Act.

### JURISDICTION AND VENUE

15.     This Court has jurisdiction over Plaintiff's federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), as this case involves questions of federal law and equal rights.

16.     This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same

case or controversy under Article III of the United States Constitution. Plaintiff's state law claims share all common operative facts with his federal law claims, and the parties are identical. Resolving Plaintiff's federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

17. Venue is proper in, and Defendants are subject to, the personal jurisdiction of this Court because Defendant COD/DPD maintains facilities in this District, and all or most of the events giving rise to this action occurred in this District. 28 U.S.C. § 1391(b); 42 U.S.C. § 2000e-5(f)(3).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

18. Plaintiff timely filed charges of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). On or about June 1, 2018, the EEOC issued Plaintiff Notice of Right to Sue.

19. Plaintiff has timely filed this action and has complied with all administrative prerequisites to bring this lawsuit.

## FACTUAL ALLEGATIONS

20. At all times material to this action, Plaintiff Johnny Strickland was employed by Defendant COD/DPD as a police officer.

21. As part of his job, Plaintiff was responsible for law enforcement in the City of Detroit.

22. Plaintiff is African American, and as such is a member of a protected class.

23. Defendants maintained a racially hostile work environment that was characterized primarily by white supervisory police officers directing abusive, discriminatory and retaliatory acts at African American subordinates. These conditions were exacerbated by mass media and social media comments by Detroit Police Department personnel that communicated racist, racially coded and demeaning messages. Examples include:

- "The only racists here are the piece of shit Black Lives Matter terrorists and their supporters…"

- "Getting rid of residency was the best thing that ever happened to the Detroit Police!!! We have to police the garbage but you can't make us live in the garbage." (This statement was posted about a city with a majority African American population.)

- One post expressed a desire to send a Terminator back in time to kill Whoopi Goldberg and Al Sharpton's parents.  When the post was criticized as racist, the response to the critic was "[Your] Chaldean ass will be deported soon enough."

- Insensitivity to the seriousness of the department's racial climate was betrayed by a 2015 comment by Assistant Chief Steve Dolunt:

7

"Some whites don't like blacks, some blacks don't like whites.

Some men don't like women, some women don't like blacks.  I've

dealt with racial tension before.  And I'm not the most PC person,

but get over it. You're wearing blue."

Defendant Craig and others in police department leadership knew, or should have

known, about these statements and other forms of racial discrimination and

harassment, and they failed to act in ways to effectively counteract resulting

damage to the racial climate within the police department.

24.    Plaintiff, like other police officers, became aware of various incidents

of racial discrimination, harassment, retaliation, racial statements and other

components of a racially hostile work environment during his employment with

Defendant COD/DPD.

25.    Allegations that white supervisory officers were engaged in a pattern

of racially discriminatory practices and harassment against African American

officers prompted Defendant Craig, the highest ranking officer in the department,

to constitute a special investigatory committee to look into these allegations.  The

committee was known as the "Committee on Race and Equality (CORE)."  On or

about January 12, 2017 Defendant Craig received a report from this committee that

referenced numerous accounts of tensions between white supervisory officers and

black officers.  After the report was released, news outlets reported Defendant

8

Craig's announcement that he was placing the work of CORE "on hold."  Further, Defendant Craig was quoted as describing the CORE report as based on "rumor and innuendo."

26.    In relevant part, the report states: "Our research revealed numerous incidents which involved some direct or indirect involvement of Command staff members in discriminatory practices, which included intimidation and retaliatory behavior.  The committee therefore determined that there were enough incidents to conclude that the department has a growing racial problem.  As an example the department, which is 67% African American, has certain units such as Crime Analysis, 30 series, Cease Fire/Gang Intel and other Task Force units that are not seniority based which are segregated.  These units have been historically, overwhelmingly staffed by white male officers."  The report goes on to state: "African American officers reported incidents of disparate treatment, where calls were made to the personal cellphones of white officers by white Command Officers, in some cases while black officers were present, where it was suggested that the white officer put in for training or for job openings that had become available in those segregated units.  Excuses were made or retaliation was expressed in other ways such as leave day request and transfer denials, etc. if black officers were to complain.  African American officers reported retaliatory tactics aimed at those officers who saw bias in the process of appointments to the rank of

9

Detective. A few white Command Officers were blatant in their attacks against black officers who voiced their dissatisfaction with the exam or sought redress through the collective bargaining process. There were common threads in all of the testimony given; repeat offenders amongst the white Command Officers."

27. The report states: "…[O]f great concern are the imbedded racial attitudes and behavior exhibited by some in the Command Staff. Throughout the fact-finding process, which included one on one interviews, private conversations and discussions at the committee table it was determined that the problems within the department were [not][1] isolated cases of officer to officer but more wide-spread, centralized in terms of distribution, or top-down entrenched discriminatory practices. Simply put, the racism that exist in the department trickles down from the Command Officers to the rank and file." Plaintiff observed or learned from others about incidents of the type that were the basis for the conclusions reached by the CORE committee.

28. The CORE report constituted one form of documented notice to Defendant Craig of the existence of a hostile work environment. Regardless of his personal opinions about the credibility of the report Defendant Craig was legally obligated to investigate its assertions and alert all appropriate personnel of the possibility of the existence of a hostile work environment and to otherwise remedy

---

[1] The word "not" does not appear in the text of the CORE report but is included here because of a good faith belief that its omission was a typographical error.

10

conditions that caused discrimination and a racially hostile work environment. Given the nature of the report, a special caution should have been given to white supervisory officers who dealt with black subordinates, and Defendants should have otherwise supervised, disciplined and trained department personnel to prevent racial harassment, intimidation and discrimination. However, Defendants either took no such actions, or took actions that were ineffective.

29. On or about January 22, 2017 (about ten days after release of the CORE report), Plaintiff was off-duty and inadvertently entered an unsecured suspected crime scene under investigation. Plaintiff was approached by Defendant Ballinger, a white officer. Plaintiff identified himself as a police officer, whereupon Defendant Ballinger in the presence of other officers, screamed profanities in Plaintiff's face and sarcastically ridiculed Plaintiff's tenure on the police force. Among other things, Defendant Ballinger called Plaintiff "stupid," "dumb," and "idiot." With respect to Plaintiff's service in the police department, Defendant Ballinger said: "You have ten years [on the force]. So you think you know every fucking thing."

30. Although Plaintiff was accused of not leaving the scene when ordered, he was given no opportunity to leave before Defendant Ballinger unlawfully placed Plaintiff in handcuffs and detained him with malicious intent and without cause or justification of any kind. Defendant Schimeck, a white officer, tightened the

11

handcuffs with malicious intent to a degree that they caused physical injury to Plaintiff.  Defendant Schimeck refused, with malicious intent, to remove or loosen the handcuffs even after Plaintiff complained and had established to everyone's satisfaction that he was a police officer and posed no threat or danger to anyone present.  Ultimately, the handcuffs were loosened by the only African American officer on the scene.

31.     When Plaintiff was finally released from the handcuffs he complained of physical injury, but contrary to the officers' duty to render aid, he was offered no medical assistance.  As Defendant Bliss, a white supervisory officer, escorted Plaintiff to his car, he directed Plaintiff to refrain from reporting his experience by saying: "This goes nowhere from tonight."  When Plaintiff responded that he would complain, Defendant Bliss warned him there would be consequences and repercussions.  Upon arrival at Plaintiff's vehicle, Plaintiff discovered that in the absence of probable cause or a search warrant, a K-9 search had been conducted of his private vehicle by Defendant Murdock, a white officer, without Plaintiff's knowledge or consent.  The search left the passenger compartment in disarray and soiled by mud.

32.     On or about the day of the encounter with the white officers, Plaintiff complained to his immediate supervisor, Sgt. Quentin Maxey, about the incident and resulting physical, mental and emotional injuries.  Sgt. Maxey in turn advised

his supervisor Lt. Sonia Russell who, upon information and belief, directed Sgt. Maxey to send a report to Internal Affairs.  Soon thereafter, Plaintiff had a more thorough discussion of the incident with Sgt. Maxey, and it was during that discussion that racial implications of the incident were considered in detail.  After this information was made available to Lt. Russell, she directed Plaintiff to file a complaint with the DPD equal employment opportunity unit.

33.    Internal Affairs charges were later filed against Plaintiff.  He was falsely accused of improper acts during and related to his encounter with Defendants who harassed him. Plaintiff was not advised that he faced possible charges, even as he was being interviewed regarding the charges he filed against the officers who harassed him.

34.    Adverse internal affairs decisions were rendered against Plaintiff, and he was never notified of this fact.  Plaintiff first became aware of the fact that charges were brought against him only when documents memorializing the decisions were discovered by his attorney in a packet of records provided in response to a Freedom of Information Act request.

35.    Defendant Bliss, who during the January 22nd incident declared: "This goes nowhere from tonight" as a warning to Plaintiff against reporting the harassment, was transferred to the Internal Affairs Unit.  Defendant Bliss had warned Plaintiff there would be repercussions for reporting the harassment, and

Internal Affairs did in fact make findings adverse to Plaintiff that resulted in punitive actions against Plaintiff.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF AGAINST DEFENDANT CITY OF DETROIT/DETROIT POLICE DEPARTMENT

Racial Discrimination (Hostile Work Environment) in Violation of
Title VII of the Civil Rights Act of 1964, *as amended*,
42 U.S.C. § 2000e, et seq.

36. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1 through 35, above.

37. Plaintiff was subjected to workplace harassment by Defendant COD/DPD's agents and employees because of his race, African American. Plaintiff was verbally taunted and otherwise humiliated, harassed, detained and restrained by a group of white supervisory officers. On that occasion he obtained assistance and relief from the only African American officer on the scene. This treatment received by Plaintiff was a single manifestation of numerous incidents of discrimination, harassment and retaliation directed at African American officers that were known to Plaintiff and that constituted a racially hostile employment environment. These workplace conditions were exacerbated by racial comments, racial social media posts, and accounts of discriminatory treatment of African American officers by white supervisory officers.

38. Defendant COD/DPD's agents' and employees' conduct was not

14

welcomed by Plaintiff.

39. Defendant COD/DPD's agents and employees' conduct was undertaken because of Plaintiff's race, African American.

40. The conduct was so severe or pervasive that reasonable persons in Plaintiff's position would find their work environment to be hostile or abusive.

41. Plaintiff believed his work environment to be hostile or abusive as a result of Defendant COD/DPD's agents and employees' conduct.

42. Management level employees knew, or should have known, of the abusive conduct. Management level personnel received information sufficient to raise a probability of racial harassment in the mind of a reasonable employer. The most notable source was a report on race relations commissioned by Defendant Craig. Moreover, the harassment was so pervasive, open and notorious that a reasonable employer would have had to have been aware of it. Indeed, management level employees were themselves complicit in the abusive conduct, most notably when Defendant Craig was presented with a credible report of hostile workplace conditions, and he did nothing to limit or eliminate these conditions, all to Plaintiff's detriment.

43. When an employer receives notice of a hostile work environment, that employer must take prompt and adequate remedial action. Defendant did not exercise reasonable care to prevent harassment in the workplace on the basis of

15

race, and did not exercise reasonable care to promptly correct any harassing behavior that did occur.  Specifically, Defendant Craig not only failed to direct employees to refrain from discriminatory and harassing conduct, he also communicated by way of public disparagement of the CORE report that reports of past racial discrimination and harassment were not believed and presumably future reports would likewise not be believed.  This in effect gave license to those with a predisposition to engage in racially discriminatory or racially hostile conduct.

44.     As a direct, legal and proximate result of the discrimination, Plaintiff has sustained, and will continue to sustain, economic and emotional injuries, resulting in damages in an amount to be proven at trial.

45.     Defendant's unlawful actions were intentional, willful, malicious, and/or done with reckless disregard of Plaintiff's right to be free from discrimination based on race.

### SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS CITY OF DETROIT/DETROIT POLIC DEPARTMENT AND WILSON

Retaliation in Violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e-3(a)

46.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1 through 45, above.

47.     Section 704(a) of Title VII of the Civil Rights Act of 1964, *as amended*, prohibits employers from discriminating against an employee "because

[he] has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).

48.    Plaintiff made informal and formal complaints to Defendant COD/DPD, its agents and employees opposing Defendant's unlawful, discriminatory employment practices based on race.

49.    As a result of Plaintiff's complaints, Defendant COD/DPD, Defendant Wilson and other agents and employees took materially adverse actions against Plaintiff.  These actions included, but are not limited to the filing of baseless Internal Affairs complaints against Plaintiff without notifying him or giving him any semblance of due process, and also making adverse findings regarding those complaints.  Further, Plaintiff suffered disciplinary measures as a result of these findings.

50.    Defendant COD/DPD's adverse actions constituted retaliatory workplace harassment.

51.    Defendant COD/DPD's retaliatory actions were sufficient to deter a reasonable person from engaging in protected activity under Title VII.

52.    As a direct, legal and proximate result of Defendant's retaliation, Plaintiff has sustained, and will continue to sustain injuries, resulting in damages in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS CITY OF DETROIT/DETROIT POLICE DEPARTMENT, BALLINGER,

## BLISS, MURDOCK, CRAIG AND SCHIMECK

42 U.S.C. § 1983 Violation of the Fourth and Fourteenth Amendments –
Unlawful Search and Seizure

53.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1 through 52, above.

54.     The detention and handcuffing of Plaintiff, along with the unwarranted search of Plaintiff's automobile were unreasonable under the prevailing circumstances and thus violated the Plaintiff's right not to be subjected to unreasonable search and seizure guaranteed by the Fourth Amendment of the United States Constitution.

55.     At all times relevant Defendants Ballinger, Bliss, Murdock and Schimeck acted under color of law when they unlawfully and unreasonably seized Plaintiff and searched Plaintiff's automobile (leaving the passenger compartment in disarray and soiled with mud) in violation of the Fourth and Fourteenth Amendments to the United States Constitution. Defendant Craig failed to supervise Defendants to prevent their unconstitutional search and seizure of Plaintiff and his automobile as set forth herein.

56.     Defendant Craig acting, in an official capacity, and Defendant COD/DPD failed to note and investigate credible findings by the CORE committee of racial harassment, intimidation and discrimination in the police department, and then failed to provide the supervision, discipline and training necessary to prevent

18

such racial harassment, intimidation and discrimination against Plaintiff. Defendants' failures included but were not limited to creating, tolerating and encouraging a custom, policy and practice of unlawful discrimination based on race which was the moving force resulting in the violation of Plaintiff's civil and constitutional rights. Defendants were deliberately indifferent to such duties and thereby proximately caused injury to Plaintiff as complained of herein.

57.     As a direct and proximate result of Defendants' wrongful acts, Plaintiff suffered economic damage, emotional injury, embarrassment, humiliation, public scorn, contempt, ridicule and damage to his professional and personal reputation, and the cost of replacing an automobile that, because of its connection to Defendants' unlawful acts, became a trigger for Plaintiff's emotional distress.

## FOURTH CLAIM FOR RELIEF

### Violation of Civil Rights – 42 U.S.C. §1981

58.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1 through 57, above.

59.     At all relevant times, Plaintiff was a party to an employment contract with Defendants, but Defendants converted that contract into a situation that resulted in Defendants' discrimination against Plaintiff which violated the rights of Plaintiff afforded by the Civil Rights Act of 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991.

60.     By the conduct described above, Defendants intentionally deprived Plaintiff, an African American, of rights enjoyed by white employees of Defendant COD/DPD, including but not limited to the right to make and enforce contracts in violation of 42 U.S.C. §1981.

61.     As a result of Defendants' discrimination in violation of §1981, Plaintiff has been denied employment in a workplace free of racial animus, retaliation and other forms of discrimination, thereby entitling him to declaratory and injunctive relief as well as compensatory damages.

62.     In their discriminatory actions as alleged above, individual Defendants have acted with malice or reckless indifference to the rights of Plaintiff, thereby entitling him to an award of punitive damages.

63.     To remedy the violations of the rights of Plaintiff secured by §1981, Plaintiff requests that the Court award him the relief prayed for below.

**FIFTH CLAIM FOR RELIEF AGAINST
DEFENDANTS CITY OF DETROIT/DETROIT POLICE
DEPARTMENT AND JAMES CRAIG**

Violation of Elliot-Larsen Civil Rights Act MCL 37.2202

64.     Plaintiff incorporates by reference as if fully set forth herein the allegations contained in paragraphs 1 through 63, above.

65.     By purposeful disregard of notice of a racially hostile work environment and by retaliating against Plaintiff for complaining about a racially

hostile work environment, Defendants COD/DPD and Craig caused Plaintiff to be subjected to discrimination with respect to his employment and terms, conditions and privileges of his employment because of his race and in violation of MCL 37.2202.

66.     The acts and omissions of Defendants COD/DPD and Craig classified Plaintiff in a way that deprived him of employment opportunities, and otherwise adversely affected his status as an employee because of his race and in violation of MCL 37.2202.

67.     To remedy the violations of the rights of Plaintiff, Plaintiff requests that the Court award him the relief prayed for below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

68.     For a declaration that Defendant's actions, policies, and practices as alleged herein are unlawful;

69.     For lost wages and all other compensation denied or lost to Plaintiff by reason of Defendant's unlawful actions, in an amount to be proven at trial;

70.     For compensatory damages for Plaintiff's emotional pain and suffering, in an amount to be proven at trial;

71.     For punitive damages against individual Defendants in an amount to be determined at trial;

21

72. For interest on lost wages, compensation, and damages, including pre- and post-judgment interest and an upward adjustment for inflation;

73. For an order enjoining Defendants from engaging in the unlawful acts complained of herein;

74. For reasonable attorneys' fees and costs of suit pursuant to 42 U.S.C. §§ 1988, 2000e-5(k), and other laws; and

75. For such other and further relief as this Court deems just and proper.

Respectfully submitted,


/s/ Mark P. Fancher
Mark P. Fancher (P56223)
Michael J. Steinberg (P43085)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6822
mfancher@aclumich.org

Leonard Mungo (P43562)
Cooperating Attorney, American
Civil Liberties Union
  Fund of Michigan
The Mungo Law Firm, PLC
333 W. Fort Street, suite 1500
Detroit, MI 48226
(313) 963-0407
Mungol16@msn.com


DATED: August 23, 2018

22

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all causes of action and claims to which they have a right to a jury trial.

Respectfully submitted,


/s/ Mark P. Fancher
Mark P. Fancher (P56223)
Michael J. Steinberg (P43085)
American Civil Liberties Union
  Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6822
mfancher@aclumich.org

DATED: August 23, 2018

23