UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHNNY STRICKLAND,

        Plaintiff,

v.

CITY OF DETROIT, JAMES CRAIG, MARK
BLISS, RODNEY BALLINGER, STEVEN
MURDOCK, CASEY SCHIMECK, DEANNA
WILSON,

        Defendants.

_____/

Case No. 18-12640

Honorable Nancy G. Edmunds

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [36]

This matter is before the Court on Defendants' motion for summary judgment. (ECF no. 36.) Plaintiff filed a response brief in opposition and Defendants filed a Reply. (ECF nos. 39, 40.) The Court heard Defendants' motion on August 21, 2019.

## I.   Background and Facts

Plaintiff Johnny Strickland is an African American police officer and an eleven-year veteran of the Detroit Police Department. (Am. Compl. ¶ 1, ECF no. 19; Strickland Dep. 20, Def.'s Mot. Summ. J., Ex. 2, ECF 36-3.) Defendants are the City of Detroit (COD), several employees of the COD and the police department sued in their individual and/or official capacities, and Detroit Police Chief James Craig, sued in his official and individual capacities. (ECF no. 19 ¶¶ 4-11.) Plaintiff brings the following claims: Racial discrimination (hostile work environment) in violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e, et seq. (Count 1, against Defendant COD); retaliation in

violation of Title VII of the Civil Rights Act of 1964, *as amended*, 42 U.S.C. § 2000e-3(a) (Count 2, against Defendants Sergeant Deanna Wilson and COD); violation of the Fourth and Fourteenth Amendments, 42 U.S.C. § 1983, unlawful search and seizure and excessive force (Count 3, against Defendants COD, Sergeant Rodney Ballinger, Captain Mark Bliss, Officer Steven Murdock, Chief James Craig and Officer Casey Schimeck); and violation of civil rights, 42 U.S.C. § 1981 (Count 4). (ECF no. 19.)

There are two distinct sets of circumstances at issue in this case. The first relates to Plaintiff's allegation that "Defendant maintained a racially hostile work environment that was characterized primarily by white supervisory officers directing abusive, discriminatory and retaliatory acts at African American subordinates." (ECF no. 19 ¶ 20.) In his complaint, Plaintiff alleges that during his employment with Defendant COD he became aware of incidents of harassment, racial discrimination, racial statements and retaliation and he refers to several "mass media and social media comments by Detroit Police Department personnel that communicated racist, racially coded and demeaning messages." (ECF no. 19 ¶¶ 20, 21.) He testified in his deposition to several specific occurrences of which he had knowledge. (Strickland Dep., Defs.' Mot. Summ. J. Ex. 2, ECF no. 36-3.) These are detailed below in the analysis of Plaintiff's hostile work environment claim. Plaintiff also refers to "recurring incidents of white command officers harassing black subordinates and discriminating against them in job assignments and training opportunities." (Pl.'s Resp. 2, ECF no. 39, citing Inter-Office Memorandum Committee on Race and Equality, Pl.'s Resp. Ex. 3, ECF No. 39-4.) It is against this backdrop that the second set of circumstances on which Plaintiff's claims are based occurred. The "critical incident," as Defendants refer to it, occurred on January 22, 2017, between Plaintiff and several of the named Defendants.

In February 2016, Defendant Craig established CORE (Committee on Race and Equality, hereinafter "CORE"), described by Craig as a committee to "kind of do a loose assessment" following some "perceptions" and "loose conversation" that had come to his attention that there may be some "tension" within the department related to race. (Inter-Office Memorandum Committee on Race and Equality (CORE), Jan. 12, 2017, Pl.'s Resp. Ex. 3, ECF no. 39-4; Craig Dep. 8-9, Defs.' Reply Ex. 1, ECF no. 40.) While Plaintiff refers to CORE as an "investigatory committee," Defendant Craig states that "it was that committee's charge not to do an investigation but pretty much just kind of get a post of what was going on." (Pl.'s Am. Compl. ¶ 22, ECF no. 19; Craig Dep. 9.) When CORE completed its work, it submitted an Inter-Office Memorandum dated January 12, 2017, with the subject line "Investigative Summary With Recommendations From The Committee On Race And Equality (CORE)" (the "CORE Report"). (CORE Report, Pl.'s Resp. Ex. 3, ECF no. 39-4.) The CORE Report stated in part:

> Our research revealed numerous incidents which involved some direct or indirect involvement of Command staff members in discriminatory practices, which involved intimidation and retaliatory behavior. The committee therefore determined that there were enough incidents to conclude that the department has a growing racial problem. . . .

> African American officers reported retaliatory tactics aimed at those officers who saw bias in the process of appointments to the rank of Detective. A few white Command Officers were blatant in their attacks against black officers who voiced their dissatisfaction with the exam or sought redress through the collective bargaining process.

(CORE Report 2, ECF no. 39-4.) Following the release of the report, the media reported Defendant Craig as saying "A lot of what CORE uncovered was based on rumor. . . . CORE co-chair Officer Weekley pointed out that he found nothing of substance." (Metro Times, *"Racial Committee Co-Chair Blasts Detroit Police Chief for Undermining Reports of Bias,"*

1/12/2017, Pl.'s Resp. Ex. 5, ECF no. 39-6.)

Less than two weeks later, in the early morning hours of January 22, 2017, Defendant Officer Casey Schimeck, a Caucasian female, and her more experienced partner, Officer Lawrence Blackburn, an African American, made a run to a BP gas station regarding a suspicious package. (Schimeck Dep. 10, Defs.' Mot. Summ. J. Ex. 4, ECF no. 36-5.) When they arrived at the scene, the fire department was on the scene and fire trucks were blocking off Jefferson Avenue and side streets. (*Id.* at 14.) The fire trucks and police cars had their lights on. (*Id.* at 40:17-19.) Defendant Schimeck was across Jefferson Avenue from the gas station when she observed the gas station and an object next to one of the gas pumps. (*Id.* at 12-13.) She and her partner had the fire trucks reposition to block off more side-streets and more of Jefferson Avenue. (*Id.* at 15.) There was a clerk inside the gas station building and it was established that he was the only person in the building at that time. (*Id.* at 17.) Defendant Sergeant Rodney Ballinger, a Caucasian officer, arrived at the scene approximately five minutes later and confirmed with binoculars that the object next to one of the gas pumps was a grenade. (*Id.* at 19; Strickland Dep. 124:20-21, Defs.' Mot. Summ. J. Ex. 2, ECF no. 36-3.) Defendant Ballinger notified the Notification and Control Center, which would direct the Bomb Squad to the scene. (Schimeck Dep. 19.)

Plaintiff Sergeant Strickland (prior to his promotion to sergeant) was off duty at the time and pulled into the gas station lot and stopped at a pump.[1] (Strickland Dep. 112-13,

---

[1] The claims in this case are fact-intensive, and for purposes of this motion for summary judgment the Court construes the facts in "the light most favorable to the non-moving party." *Hager v. Pike Cnty. Bd. Of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002). Despite points of dispute between the parties, with respect to the claims disposed of herein there are no genuine issues of material fact such as to defeat Defendants' motion for summary judgment.

120; Ballinger Dep. 15, Defs.' Mot. Summ. J. Ex. 5, ECF 36-6.) According to Plaintiff, the gas station was not secure, there was no crime scene tape, and there were no police cars at any entrance. (Strickland Dep. 118-20.) The parties agree that when Plaintiff emerged from his car, there was shouting; Plaintiff describes it as "a commotion," that ensued. (Strickland Dep. 113; Ballinger Dep. 15-16.) Plaintiff described that he heard "What the fuck are you doing? Get the fuck out of there. Get the hell away from there," he did not know who it was coming from, and "[n]obody identified themselves." (Strickland Dep. 113-14.) Defendant Ballinger testified that the officers were yelling "you need to get out of there" and giving loud verbal commands to leave; Ballinger recalls telling Plaintiff to "get the fuck out of here" or "something to that effect," but does not recall the other officers using profanity and does not recall identifying himself by name to Plaintiff. (Ballinger Dep. 14, 17:12-20, 22:12-22, 23:3-12, 34-35; Strickland Dep. 123).

Defendants testified that Plaintiff did not initially identify himself as a police officer, and instead responded with "something to the effect you can't talk to me like that, you don't know who I am." (Ballinger Dep. 15; Schimeck Dep. 22 "He said you don't know who I am.") The parties agree it was a foggy night and vision was not clear. (Ballinger Dep. 11, 15; Strickland Dep. 115-16.) Defendant Ballinger approached Plaintiff, handcuffed him and walked him back to Ballinger's car. (Schimeck Dep. 26.) Defendant Ballinger testified that Plaintiff did not identify himself as a police officer prior to being placed in handcuffs; Plaintiff testified that he identified himself as soon as he saw Ballinger come out of the fog and he saw a uniform. (Ballinger Dep. 19; Strickland Dep. 115.) There is no dispute that Defendant Ballinger gave directives to Plaintiff ("get out") prior to Plaintiff identifying himself. There are questions of fact as to who identified themselves and when, yet it is not in dispute that a

period of time lapsed after Plaintiff was initially directed to leave and before Plaintiff identified himself as a police officer. (Strickland Dep. 114-16.)

Plaintiff testified that the handcuffs were not double-locked and they began to tighten and cause him pain. (Strickland Dep. 52, 58-59.) He also testified that the officers made fun of him, and that Defendant Ballinger called him dumb, stupid, and an idiot, used profanity, and disrespected both Plaintiff and Plaintiff's ten years on the police force. (Strickland Dep. 122-26.) Defendants Schimeck and Ballinger do not deny using profanity. (Schimeck Dep. 31; Ballinger Dep. 17.) Plaintiff testified that Ballinger walked him back to the squad car and told Schimeck, "Hey, watch him." (Strickland Dep. 126.) Defendant Schimeck yanked on the cuffs and they tightened more. (Strickland Dep. 126-29.) Plaintiff testified that he notified Defendant Schimeck that the handcuffs were too tight, but she did not respond; Defendant Schimeck testified that when he said the handcuffs were hurting, her partner said she could let go of the handcuffs and she did so. (Strickland Dep. 131:18-19; Schimeck Dep 33-34.) When Plaintiff complained to Schimeck's partner that the handcuffs were too tight, he loosened them and double locked them to prevent them tightening any further. (Strickland Dep. 137-38; Wilson Dep. 38, ECF no. 36-19.) When Defendant Mark Bliss, a supervisory officer and Caucasian, arrived on the scene, Plaintiff told him what was going on and shortly thereafter, Defendant Bliss advised the officers to take the handcuffs off Plaintiff. (Strickland Dep. 129: 7-8, 136.) Plaintiff was in the handcuffs approximately twenty or twenty-five minutes in total. (Strickland Dep. 138.)

Plaintiff alleges that Defendant Bliss made the statement to Plaintiff, "This goes nowhere from tonight." (Strickland Dep. 135.) Plaintiff alleged in his deposition that Defendant Bliss "also made a statement along the lines of if I said anything or made

mention of it again, there would be consequences or repercussions." (Strickland Dep. 135.) During this incident, Defendant Murdock, an African American officer, executed a canine search of Plaintiff's car; Plaintiff testified that the dog was in his car for less than a minute, as he recalls from reviewing a video of the gas station lot. (Strickland Dep. 129:3-4, 132; Murdock Dep. 14, Defs.' Mot. Summ. J. Ex. 7, ECF no. 36-8.) The constitutionality of the canine search is also at issue in Plaintiff's claims.

Following the incident, Defendant Bliss contacted someone from Plaintiff's command to notify them of what had transpired and that an investigation would be conducted; Defendant Bliss found out later that Internal Affairs was conducting the investigation. (Bliss Dep. 28, 29.) As set forth in more detail below, Plaintiff filed an internal "EEO" complaint about the January 22 incident, designating "race" and "retaliation" as the basis for his complaint. (Charge of Discrimination/Harassment Report 1/24/17, Defs.' Mot. Summ. J. Ex. 13, ECF no. 36-14.)

The Internal Affairs investigation was assigned to Defendant Wilson and conducted with a partner. (Wilson Dep. 8-9, Defs.' Mot. Summ. J. Ex. 18, ECF no. 36-19; Inter-Office Memo. Internal Affairs 2, Defs.' Mot. Summ. J. Ex. 6, ECF no. 36-7.) The allegation being investigated was made by Plaintiff: that members of the police department mistreated him during an off duty incident at a gas station on January 22, 2017. (Inter-Office Memo. 1, ECF no. 36-7.) Subjects of the investigation were Defendants Ballinger and Schimeck, Officer Blackburn and Plaintiff. Facts related to the investigation are set forth in more detail below, in the analysis.

Plaintiff had alleged injury and pain to his wrists from the handcuffing, yet during the course of the investigation, Defendant Wilson's partner mentioned having seen Plaintiff

working out, after the time of the incident and injury, at a fitness center at which they were both members. (Wilson Dep. 22-24, Defs.' Mot. Summ. J. Ex. 18, ECF no. 36-19.) Defendant Wilson obtained a print out of Plaintiff's attendance at the fitness center and asked her partner to record Plaintiff working out there. (Wilson Dep. 22-24, Defs.' Mot. Summ. J. Ex. 18, ECF no. 36-19; Inter-Office Memo. 11, ECF no. 36-7.)

As a result of the Internal Affairs investigation, Defendant Wilson recommended charges against all officers, including one charge of "failure to exhibit a polite, dignified and courteous manner towards any person (includes detainees and fello (sic) officers" against the two defendants, and three charges against Plaintiff related to actions that came to light during the internal affairs investigation. These included Plaintiff's obtaining the gas station's surveillance video on his own personal flash drive and withholding information in an ongoing criminal investigation. (Wilson Dep. 14-15; Inter-Office Memo. 36-38, ECF no. 36-7.) The third recommended charge against Plaintiff was for neglect of duty, because Plaintiff failed to document on his activity log that he had reviewed the gas station video. (*Id.*) The Internal Affairs report is discussed in more detail below.

Plaintiff alleges that as a result of Defendants' actions he has suffered emotional trauma that is likely to be permanent and physical injuries.

## II.   Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A moving party may meet that burden "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). "The court

need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must present some evidence in support of its complaint to defeat a motion for summary judgment, and show that a genuine issue for trial exists—i.e., that "a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citing *First Nat. Bank of Ariz. v. Cities Servs. Co.*, 391 U.S. 253, 289 (1968)). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, *id.* at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party." *Hager v. Pike Cnty. Bd. Of Educ.*, 286 F.3d 366, 370 (6th Cir. 2002).

## III.  Analysis

### A.  Racially Hostile Work Environment

#### 1.  Whether Harassment Was Based On Race

"Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Williams v. General Motors*, 187 F.3d 553, 560 (6th Cir. 1999) (citing 42 U.S.C. § 2000e-

2(a)(1)). To establish a Title VII case of a racially hostile workplace, as Plaintiff claims, Plaintiff must show: "(1) [He] is a member of a protected class; (2) [he] was subjected to unwelcomed racial harassment; (3) the harassment was race based; (4) the harassment unreasonably interfered with [his] work performance by creating an environment that was intimidating, hostile, or offensive; and (5) employer liability." *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 706 (6th Cir. 2007) (citing *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999)). Plaintiff is a member of a protected class- he is African American. (Am. Compl. ¶ 19, ECF no. 19.)

Defendants first argue that Plaintiff offers no direct evidence or comparative evidence to support that he was subjected to harassment based on race. Plaintiff points out that the Sixth Circuit, following the Supreme Court, has recognized a "totality of the circumstances" approach in hostile environment cases. *See Williams*, 187 F.3d at 562 (citing *Harris v. Forklift Systems*, 510 U.S. 17, 23 (1993)). Yet "only harassment *based on the plaintiff's race* may be considered." *Williams v. CSX Transportation Co.*, 643 F.3d 502, 511 (6th Cir. 2011). A plaintiff may prove race-based harassment by "direct evidence of the use of race-specific and derogatory terms or . . . comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Id.* at 511. "Conduct that is not explicitly race-based may be illegally race-based and properly considered in a hostile-work-environment analysis when it can be shown that but for the employee's race, []he would not have been the object of harassment." *Clay*, 501 F.3d at 706. "[A] work environment viewed as a whole may satisfy the legal definition of an abusive work environment, for purposes of a hostile environment claim, even though no single episode crosses the Title VII

threshold." *Williams,* 187 F.3d at 564.

Plaintiff does not allege that overt racial comments were made during the January 22, 2017 incident, nor is there evidence of the same. The overarching theory of Plaintiff's claim is that the Chief of Police created CORE, then the Chief denied there were any race issues in the department, thus sending "the message to all white supervisory officers" that disrespecting black officers was okay, resulting in Plaintiff being disrespected by white officers and his Constitutional rights violated. (Strickland Dep. 127.) Plaintiff alleges that the January 22, 2017 encounter in which he was yelled at by other police officers and ended up in handcuffs was the "manifestation of numerous incidents of discrimination, harassment and retaliation directed at African American officers that were known to Plaintiff and that constituted a racially hostile employment environment. These workplace conditions were exacerbated by racial comments, racial social media posts, and accounts of discriminatory treatment of African American officers by white supervisory officers." (Am. Compl. ¶ 34.)

With respect to Plaintiff's interaction with officers at the scene on January 22, 2017, a reasonable jury could not find that the January 22 incident was based on race. Plaintiff generally alleges that he was "disrespected" but does not allege racial references in that exchange. (Strickland Dep. 126-27.) There is no direct evidence of racial causation, no comparable evidence offered as to how a member of another race would have been treated, if showing up at the gas station where the grenade was located, no evidence tying those officers at the gas station with the other allegedly racial comments that Plaintiff offers as evidence, and Plaintiff was not on duty or at work when the January 22 incident occurred. As set forth in further detail below, Defendant Officers' actions during that

incident were not unreasonable.

The next question is whether a reasonable jury could find that the multiple racial occurrences Plaintiff alleges having heard about were actually based on race. They include:

- An African-American friend and co-worker was called "boy" by a fellow officer who was white. (Strickland Dep. 65, Defs.' Mot. Summ. J. Ex. 2, ECF 36-3.)

- A social media posting stated: "The only racists here are the piece of shit Black Lives Matter terrorists and their supporters." (Am. Compl. ¶ 20; Strickland Dep. 85, ECF 36-3.) (Plaintiff had no recollection in his deposition who made the statement or when, only that it was made by someone else who works for the police department. He simply knows that the statement was made and remembers hearing about it at the time it was made. Strickland Dep. 85-86).

- A Snapchat video posted by a member of the police department and depicting a black female motorist after a traffic stop that resulted in the impounding of the vehicle she had been driving. The motorist walked away in freezing temperatures and one of the involved members of the police department recorded her on his cell phone. Officers could be heard mocking her in the background and the video was edited to include captions containing the words "What black girl magic looks like" and "Celebrating Black History Month." (6th Precinct Environmental Audit 6, Pl.'s Resp. Ex. 1, ECF no. 39-2.) (Plaintiff cites to the Environmental Audit, which identifies reports of this video surfacing in February 2019, and a news article regarding the same is from January 2019. (Pl.'s Resp. 2, citing ECF no. 39-2; see also ECF no. 39-3.))

- Two officers referred to black females as "Keishas" and one of the officers referred to black males as "Homies." (6th Precinct Environmental Audit 11, Pl.'s Resp. Ex. 1, ECF no. 39-2.) (Plaintiff's response cites an Environmental Audit as support for these comments occurring; Plaintiff does not cite to testimony or other evidence that he had knowledge of this comment aside from the Environmental Audit provided with his response brief. (Pl.'s Resp. 2, citing ECF no. 39-2.))

- "In September 2018, white rookie officer . . . was terminated after posting a smug uniformed selfie with the caption: 'Another night to Rangel (sic) up these zoo animals.'" (1/31/2019 Metro Times article, Pl.'s Resp. Ex. 2, ECF no. 39-3.) (Plaintiff's response cites a 2019 news article as support for this comment, again, with no citation to testimony or other evidence as to when he had knowledge of this comment, aside from the January 2019 news article. (Pl.'s Resp. 2, citing ECF no. 39-3.))

- "[A]n officer called the citizens of Detroit 'garbage' in the comments section of a news story . . . ." The statement was "Getting rid of residency was the best thing that ever happened t the Detroit Police!!!!! We have to police the garbage but you can't make us live in the garbage." (Am. Compl. ¶ 20; 1/19/17 Metro Times article, Defs.' Mot. Summ. J. Ex. 15, ECF no. 36-16.) (Plaintiff does not recall who made the statement or when he heard it, but testified that it was in "some form of media" and it was

directed at him, because he lives in the city. (Strickland Dep. 89-90, ECF no. 36-3.))

- A social media posting expressed a desire to "send a Terminator . . . back in time to take out Whoopi Goldberg and Al Sharpton's parents." When someone responded that the post sounded racist, the author responded "Don't matter anyways, your Chaldean ass will be deported soon enough . . . ." (Am. Compl. ¶ 20; motorcitymuckraker.com, Jan. 3, 2017, Defs.' Mot. Summ. J. Ex. 15, ECF no. 36-16.) (Plaintiff remembers hearing about this post, and admits it was not directed at him. (Strickland Dep. 94.))

A review of the basis for most of these occurrences shows that Plaintiff does not have first hand knowledge or even a recollection of who made the comment, or where or when he learned of it, as indicated in the parenthesis following each comment above. For two of these occurrences, the cited and provided material reporting each occurrence post-dates both the August 23, 2018 initiation of Plaintiff's lawsuit and his November 20, 2018 amended complaint. (ECF nos. 1, 19.) The Snapchat video reportedly surfaced in February 2019 and was reported by a newspaper in January 2019. (ECF no. 39-2.) The "Keishas" and "Homies" comments followed traffic stops in December 2018. (ECF no. 39-2.)  The comment about wrangling "up these zoo animals" was reportedly posted by an officer in September 2018 and was reported in a January 2019 news article[2]. (ECF no. 39-3.) There is no evidence that Plaintiff witnessed nor learned of these three occurrences outside the context of this litigation, given his inability to recollect where and how he heard about them and/or citation to an environmental audit that, while undated, must post-date the references within it, such as to February 2019. *See Armstrong v. Whirlpool Corp.*, 363 Fed. Appx. 317, 329-30 (6th Cir. 2010) ("[T]he district court correctly excluded evidence of discrimination

---

[2] Plaintiff states in his response that "[w]hite police officers have recently been fired from the police force," including those that created the Snapchat video and referred to African American citizens as "Keishas" and "Homies." (Pl.'s Rep. 10, ECF no. 39.)

that [the plaintiff] neither witnessed nor learned of outside the context of this litigation.").

Defendants argue that of the remaining occurrences, only two contain conduct that could possibly be considered based on race, and that neither of these were race specific, either. The Court disagrees. With respect to allegations that an African American co-worker was called "boy" by a white supervisor, the Supreme Court has found that a court cannot summarily disregard the racial implications of the term. *See Ash v. Tyson Foods*, 546 U.S. 454, 456 (2006) (Although the court of appeals concluded that "the use of 'boy' alone is not evidence of discrimination', the Supreme Court held that "[i]nsofar as the Court of Appeals held that modifiers or qualifications are necessary in all instances to render the disputed term probative of bias, the court's decision is erroneous." "Although it is true the disputed word will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign. The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage.").

Defendants further argue that this incident is inadmissible hearsay. While it is true that the Sixth Circuit has held that "comments or conduct of which a plaintiff had no knowledge cannot be said to have made her work environment hostile," when considering "other-act evidence" the Sixth Circuit has made a distinction with respect to conduct of which a plaintiff has become aware, holding that "case law 'makes clear that we can consider evidence of other acts of harassment *of which a plaintiff becomes aware* during the period [of] his or her employment, even if the other acts were directed at others and occurred outside the plaintiff's presence.'" *Armstrong*, 363 Fed. Appx. at 328 (citing *Barrett v. Whirlpool*, 556 F.3d 502, 515 (6th Cir. 2009) and *Hawkins v. Anheuser-Busch, Inc.*, 517

F.3d 321, 335 (6th Cir. 2008), respectively).

Defendants also argue that a comment made by a former assistant chief, while it includes a reference to race, is not specific to a single race and is not derogatory. At a meeting in 2015, the former assistant chief had reportedly stated, "Some whites don't like blacks, some blacks don't like whites, some men don't like women, and some women don't like blacks[3]. I've dealt with racial tension before. I'm not the most PC person, but get over it. You're wearing blue." (Strickland Dep. 95, Defs.' Mot. Summ. J. Ex. 2, ECF no. 36-3; 1/19/17 Metro Times Article, *Detroit Police Official On Racial Tensions: 'Get Over It'*, Defs.' Mot. Summ. J. Ex. 15, ECF no. 36-16.) Plaintiff characterizes this as "the Assistant Chief's suggestion that officers ignore acknowledged racial tensions." (Pl.'s Resp. 9, ECF no. 39.)

The Court finds that the few remaining comments, when considered in context, contained derogatory terms sufficient to raise a jury question as to whether they were based on race. The Court now considers the fourth element of a hostile work environment claim, whether "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment." *Williams*, 643 F.3d at 511.

## 2. Whether The Conduct Was Severe Or Pervasive

"[T]he question of "[w]hether conduct is severe or pervasive is 'quintessentially a question of fact.'" *Clay*, 501 F.3d at 707 (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)). Yet the Sixth Circuit has "affirmed grants of summary judgment,

---

[3]This is the quote from both the news article and the deposition, yet Defendants use brackets in their version of the quote to indicate that it should have read "some women don't like [men]." (Defs.' Mot. Summ. J. 12, ECF no. 36.)

determining that as a matter of law, the conduct complained of was not sufficiently severe or pervasive." *Id.* (citations omitted). "[T]he focus of the objective/subjective inquiry should remain on (1) whether a reasonable person would find the environment objectively hostile, and (2) whether the plaintiff subjectively found the conduct 'severe or pervasive.'" *Williams*, 187 F.3d at 568.

"Comments that single out members of a protected class are relevant not only as to whether a particular work environment was objectively hostile to members of the protected class, but also as to whether an employee belonging to the protected class subjectively felt harassed." *Jackson v. Quanex*, 191 F.3d 647, 661 (6th Cir. 1999) ("Evidence of racist conduct affecting African-American employees certainly mattered as to whether the work environment . . . was objectively hostile to African Americans, and evidence that [the plaintiff] learned of these incidents clearly demonstrated that, as an African American, she subjectively perceived that her work environment was one hostile to her."). Courts credit "evidence of racial harassment directed at someone other than the plaintiff when the plaintiff knew a derogatory term had been used." *Jackson*, 191 F.3d at 661 (citing *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1079 (6th Cir. 1999)).

"[T]he Supreme Court formulated the objective part of the inquiry not as addressing whether an objectively hostile work environment existed beyond the plaintiff's knowledge, but instead as asking whether a reasonable person would find the discriminatory conduct hostile or abusive." *Armstrong*, 363 Fed. Appx. at 328-29 (citing *Harris*, 510 U.S. at 21-22). "[T]he Court's focus in the objective part of the inquiry is on determining what type of conduct would actually 'alter the conditions of the victim's employment and create an

abusive working environment.'" *Id.* at 329. Although courts are to consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance," "the inquiry is not subject to any precise mathematical test." *Id.* at 324 (citations omitted).

There are just over half-dozen occurrences that span approximately a three-year period (2015-January 2019). In some instances it is difficult to determine when the comment was made or originated, versus when it was reported through media, and Plaintiff's testimony on most of the comments remains vague at best, he often does not recall where, when or from whom he learned of the comment (as noted with each comment, above). While most of the comments can be described as "insensitive, ignorant, and bigoted," similar to the comments in *Williams v. CSX*, they "more closely resemble a 'mere offensive utterance' than conduct that is 'physically threatening or humiliating.'" *Williams*, 643 F.3d at 513.

Of the multiple racial comments Plaintiff alleges having heard about, two of them were directed to citizens subject to policing, including the woman who was recorded walking away from her impounded car, and white officers who referred to African Americans as Keishas and Homies. Two other incidents, comments by police department employees on social media posts, were offensive comments aimed at Detroit residents, who are predominately African American (referring to living in Detroit as living "in garbage"[4] and

_____

[4] Plaintiff testified that he did not know who made the statement, does not know when he heard the statement, but agreed that it was said in "some form of media." (Strickland Dep. 89-90.)

referring to police work as wrangling "up the zoo animals"). Although the comments were not directed at Plaintiff, or even directed at other police officers or employees within the department, "an employer may create a hostile environment for an employee even where it directs its discriminatory acts or practices at the protected group of which the plaintiff is a member, and not just at the plaintiff [him]self." *Jackson*, 191 F.3d at 661 (citing *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66 (1986) (The Supreme Court in *Meritor* recognized that in *Rogers v. EEOC*, 454 F.2d 234 (5th Cir. 1971), "the first case to recognize a cause of action based upon a discriminatory work environment," "the Fifth Circuit held that a Hispanic complainant could establish a Title VII violation by demonstrating that her employer created an offensive work environment for employees by giving discriminatory service to its Hispanic clientele.").

Yet these statements are not actionable by this Plaintiff without more. Plaintiff fails to provide evidence that he even learned of these comments while in his workplace or that any were directed at him, it appears he learned of none of them firsthand, and it remains unclear whether he learned of some of the occurrences from the audit report, from a source other than the audit report, and/or as a result of this litigation. *See Black v. Zaring Homes, Inc.*, 104 F.3d 822, 826 (6th Cir. 1997) (The Sixth Circuit acknowledged "that sex-based comments need not be directed at a plaintiff in order to constitute conduct violating Title VII" but noted that "in this case most of the comments were not directed at plaintiff; this fact contributes to our conclusion that the conduct here was not severe enough to create an objectively hostile environment."). The nature of the comments coupled with the relative infrequency of the comments, as well as the ambiguity as to when, where and how Plaintiff

became aware of the comments allows this court to find as a matter of law that the conduct was not sufficiently severe or pervasive to reach a jury.

While Plaintiff alleges that the January 22 incident has interfered with his work performance, there is no evidence on which a reasonable jury could find that the January 22 incident was based on race and/or tied to these comments. The additional comments and occurrences are not severe or pervasive enough to create a jury question on Plaintiff's hostile work environment claim.

### B. Retaliation

Plaintiff brings a retaliation claim against Defendants City of Detroit and Wilson under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a). Plaintiff alleges that as a result of his formal and informal complaints to Defendant City of Detroit, its agents and employees about unlawful and discriminatory employment practices based on race, Defendants City and Wilson took materially adverse actions against Plaintiff including the "filing of baseless Internal Affairs complaints against Plaintiff without notifying him or giving him any semblance of due process, and also making adverse findings regarding those complaints," and that Plaintiff "suffered disciplinary measures as a result of those findings." (Am. Compl. ¶¶ 45, 46, ECF no. 19.)

To establish a prima facie claim of retaliation, Plaintiff must show "(1) that []he engaged in protected activity; (2) that defendant knew of this exercise of [his] protected rights; (3) that defendant consequently took an employment action adverse to plaintiff; *and* (4) that there was a causal connection between the protected activity and the adverse employment action." *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 831 (6th Cir. 1999). Once the

Plaintiff has made this showing, the Court engages the familiar *McDonnell Douglas* burden-shifting analysis, and the burden shifts "to the employer to show that there was a legitimate, non-retaliatory reason for its actions. If the employer meets its burden, the burden shifts back to the plaintiff to show that 'there is sufficient potential proof for a reasonable jury to find the proffered legitimate reason merely a pretext for impermissible retaliation.'" *Davis v. Verizon Wireless*, 389 F. Supp. 2d 458, 477 (W.D.N.Y. 2005); *see also Mickey v. Zeidler Tool and Die Co.*, 516 F.3d 516 (6th Cir. 2008).

> Plaintiff can demonstrate that the reason given for his termination was pretext by
>
> [S]howing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. The plaintiff must produce sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendant[] did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action. To show an honest belief, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made.

*Mickey*, 516 F.3d at 526 (citations and internal quotations omitted); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

On January 24, 2017, Plaintiff filed an internal complaint about the January 22, 2017 incident in which he designated discrimination based on "race" and "retaliation." (Charge of Discrimination/Harassment Report 1/24/2017, Defs.' Mot. Summ. J. Ex. 13, ECF no. 36-14.) Plaintiff alleges in his response brief that "soon after Plaintiff filed his internal complaints, investigations were launched against Plaintiff that ultimately resulted in disciplinary action." (Pl.'s Resp. 4.) Plaintiff further alleges that Defendant Wilson directed unauthorized surveillance of Plaintiff. (Wilson Dep., 22-23, Defs.' Mot. Summ. J. Ex. 18,

Filing a complaint of discrimination is a protected activity. With respect to the second element, Defendants argue that, aside from the boxes "race" and "retaliation" checked by Plaintiff on the complaint form, "[t]here is no way a reader could conclude that Plaintiff's EEO complaint was based on either race or retaliation." (Defs.' Mot. Summ. J. 18, ECF no. 36.) Therefore, conclude Defendants, Plaintiff cannot show that he engaged in protected activity when he filed the EEO complaint. Defendants are correct that the facts alone in the body of Plaintiff's EEO complaint form do not make a connection to race, yet the selection of the "race" box at the top of the form indicates Plaintiff's allegation that the facts to follow occurred due to race. Defendants rely on *Bray v. Palm Beach Co.*, for the premise that "the facts alleged in the body of the EEOC charge, rather than merely the boxes that are marked on the charge, are the major determinants of the scope of the charge." *Bray v. Palm Beach Co.*, 907 F.2d 150, at *2 (6th Cir. 1990). *Bray* did not address the issue at bar, which is whether the EEO complaint with a box checked "race" gave notice to Defendant that Plaintiff was bringing a claim for discrimination based on race. *Bray* considered the checked box "other" and handwritten "retaliation" in the context of facts alleged in the body of the charge as to whether they raised a claim of sex discrimination that was plead at the district court, after the EEOC's final determination. *Id. Bray* is not on point and the Court finds that the indication of "race" discrimination at the top of the EEO complaint form is sufficient at this stage to raise a question of fact as to whether Defendant knew that Plaintiff engaged in a protected activity.

On January 23, 2017, Internal Affairs "received notification of an allegation of Police

Misconduct" involving the officers Ballinger, Blackburn, and Schimeck. (Inter-Office Memorandum Internal Affairs, 4/3/2017, Defs.' Mot. Summ. J. Ex. 6, ECF no. 36-7.) The Internal Affairs report includes investigation into these officers' and Plaintiff's actions during the January 22 incident, as well as investigation and surveillance of Plaintiff's activities following the incident. The investigation revealed that Plaintiff had returned on more than one occasion to the gas station where the incident occurred, to view and obtain video footage of the January 22 incident, without documenting the same. (Inter-Office Memorandum Internal Affairs, 4/3/2017, Defs.' Mot. Summ. J. Ex. 6, ECF no. 36-7; Wilson Dep. 14-15, ECF no. 36-19.)

It was also brought to investigator Defendant Wilson's attention that Plaintiff was attending a fitness center and regularly working out following the alleged injuries to his wrists from being handcuffed on January 22. Sergeant Ayala, who was assisting with the Internal Affairs investigation, brought to Wilson's attention that Plaintiff Strickland was working out at the same fitness center as Ayala and Wilson asked Ayala to try to record Plaintiff working out, which he did. (Inter-Office Memorandum Internal Affairs, 4/3/2017, at 11, Defs.' Mot. Summ. J. Ex. 6, ECF no. 36-7.)

One of the outcomes of the Internal Affairs investigation was the recommendation of three disciplinary charges against Plaintiff. Defendant concedes that "[t]here is no question that an adverse action was taken against Plaintiff." (Defs.' Mot. Summ. J. 16, ECF no. 36.) The more difficult element is whether Plaintiff has shown evidence of a causal connection between the protected activity and the adverse employment action.

With regard to the fourth element, Plaintiff argues that the connection between this

adverse employment action and his protected activity is a threat that was made to him

about the consequences of reporting the January 22 incident. (Pl.'s Resp. 21.) Plaintiff

testified to the following interaction with Defendant Bliss on the night in question:

> After speaking to Bliss explaining to him everything that happened, he made the statement, "This goes nowhere from tonight." He also made a statement along the lines of if I said anything or made mention of it again, there would be consequences and repercussions. Once we got to the gas station, I also advised him or showed him my wrists that were, at that point in time, were discolored.

(Strickland Dep. 135, ECF no. 36-3.)

Defendants argue only that Plaintiff has not offered any evidence that Defendant

Sergeant Wilson, the lead individual to conduct the Internal Affairs Investigation, knew of

his EEO complaint. "An employment decision cannot be caused by protected activity if the

decision-maker did not know about the protected activity." *Crane v. Mary Free Bed Rehab.*

*Hosp.*, 634 Fed. Appx. 518, 526 (6th Cir. 2015). Yet there is evidence to raise a question

of material fact as to the issue of whether Sergeant Wilson had knowledge that Plaintiff had

prepared a Charge of Discrimination/Harassment Report- Plaintiff's charge is noted in the

Internal Affairs report.[5] (Inter-Office Memorandum Internal Affairs, 4/3/2017, at 4, Defs.'

Mot. Summ. J. Ex. 6, ECF no. 36-7.) Defendant Wilson conducted the investigation into

---

[5] "On January 24, 2017, at 2:35 P.M., Officer Strickland reported to the Human Resources Bureau and prepared a Charge of Discrimination/Harassment Report with Ms. Alethea Johnson, Equal Employment Opportunity Coordinator." This portion of the Internal Affairs report references a document number for the EEO report "document 8-2" indicating that the author of the report, Defendant Wilson, had access to the EEO complaint at some point during the investigation and prior to making charges and disciplinary recommendations. (Inter-Office Memorandum Internal Affairs, 4/3/2017, at 4, Defs.' Mot. Summ. J. Ex. 6, ECF no. 36-7.)

Plaintiff and the other officers, and ultimately recommended the charges against Plaintiff, as well as the other officers. (*Id.*) The investigation was then reviewed by a captain and a commander who signed off on the final product. (Wilson Dep. 20-21, ECF no. 36-19.) There is a question of fact as to Wilson's knowledge that Plaintiff engaged in a protected activity.

The threats by Defendant Bliss are based on Plaintiff's testimony, and Bliss denied in his deposition that he told Plaintiff that "[t]his goes nowhere from tonight." (Bliss Dep. 28, Defs.' Mot. Summ. J. Ex. 8, ECF no. 36-9.) Defendant Bliss did admit that he contacted Plaintiff's command officer to let him know that there was going to be an investigation, because Plaintiff had told Bliss that "they didn't have to talk to me like that" when discussing the interactions Plaintiff had with the other officers at the January 22 scene. (Bliss Dep. 26-29.) Bliss indicated that he believed "based upon the information [he] got that night there was a possibility that it [misconduct] was on both sides." (Bliss Dep. 29.) Bliss later found out that Internal Affairs was taking up the investigation. (Bliss Dep. 28.)

Bliss was eventually promoted to Internal Affairs. (Bliss Dep. 29.)

> Q. You at some point were transferred to Internal Affairs yourself; is that correct? After this incident?
>
> A. I was promoted – well, not after the incident. It's been some years. I think a year. I don't exactly know the time, and when I was promoted based upon my – I previously work at Internal Affairs, Force Investigations. They said Would you like to be the Exchange Officer of Professional Standards. Yes.
>
> Q. How long did you serve in that capacity?
>
> A. About 6 months.

(Bliss Dep. 29.) Defendant Wilson testified that Defendant Bliss was not assigned to Internal Affairs until after this investigation. (Wilson Dep. 21, ECF no. 36-19.)

There is no evidence that Bliss was involved in the internal affairs investigation or assigned to internal affairs during the time of the investigation. There is no evidence that Defendant Bliss was a decision-maker in the investigation and resultant charges and recommendations, nor that he influenced Defendant Wilson or other decision-makers in this context. It is unclear how Plaintiff's testimony that Bliss said "This goes nowhere from tonight" establishes a causal connection between the protected activity and the adverse employment action.

Plaintiff alleges that he was charged with neglect of duty for allegedly failing to notate something on an activity log. (Strickland Dep. 182.) To the extent that Plaintiff alleges generally that Officer Murdock, who is white, did not complete an activity log and he was not charged with anything, Plaintiff provides no basis other than his own opinion for concluding that Murdock was negligent in failing to complete an activity log. (Strickland Dep. 184.) Murdock was in a different precinct, and position, than Plaintiff, and the underlying events on which Plaintiff bases his argument, were different.

Slightly more persuasive is the level of investigation, including additional surveillance that was applied to Plaintiff during Defendant Sergeant Wilson's Internal Affairs Investigation, coupled with the temporal relationship between the initiation of the Internal Affairs Investigation, Plaintiff's charge one day later, and the resultant investigation, charges and recommendations (less than three months from beginning of investigation and Plaintiff's charge of discrimination to the final Internal Affairs memorandum), with a question of fact as to Defendant Wilson's knowledge. In drawing all inferences in the light most favorable to Plaintiff, the Court finds that genuine issues of material fact preclude summary

judgment on this portion of the analysis and the burden shifts to Defendants to show a "legitimate, non-retaliatory reason" for their actions.

Defendants argue that they have a legitimate, nondiscriminatory reason for recommending disciplinary actions against Plaintiff. The Court agrees. Defendants argue that "[a]lthough Plaintiff was not initially the focus of the investigation this did not render him immune from possible misconduct charges" and that his rights were given to him in the presence of his union attorney; during the investigation Defendant Sergeant Wilson found that Plaintiff violated the Detroit Police Department's rules and regulations and recommended discipline with each violation. (Defs.' Mot. Summ. J. 20, ECF 36.)

The Internal Affairs report submitted by Defendant Wilson notes "that the actions of all members on scene inclusive of Officer Strickland were improper from the verbiage utilized by the responding officer to the refusal of a direct order from a law enforcement officer", members on the scene advised "Officer Strickland to leave the venue immediately and their efforts were challenged", and when "members escalated their efforts and used profanity in an attempt to get him to leave," he responded by stating, "You don't know who I am." (Inter-Office Memo. Internal Affairs, 4/3/2017, p. 35, ECF 36-7.) Plaintiff's reports of the event, including in his Charge of Discrimination and deposition tell a slightly different story about how quickly he identified himself, and also alleged that he could not see anyone at the gas station, but first heard a "commotion" and someone saying "get the fuck out of here" and "what the fuck are you doing here?" (Charge of Discrimination and Harassment, ECF No. 36-14; Strickland Dep. 114-15, ECF no. 36-3.) Yet Plaintiff does not deny saying "You don't know who I am" - he testified that he does not recall his exact response.

(Strickland Dep. 114.) Defendants also argue that the disciplinary recommendation was "endorsed through the chain of commend on three levels and Police Discipline Administration Unit, not Wilson, issued the discipline." (Defs.' Mot. Summ. J. 20, *stated without citation to supporting evidence of record.*)

Aside from Plaintiff Strickland's actions during the January 22 gas station incident, the investigation revealed further conduct by Plaintiff that resulted in three charges. The conduct involved Plaintiff accessing video tape footage of the gas station incident. Plaintiff does not address Defendants' argument that they had a legitimate, non-discriminatory reason for disciplining Plaintiff, and Defendants address the underlying charges only superficially, arguing that when an officer violates the rules and regulations of the Detroit Police, disciplinary action is recommended. (Defs.' Mot. Summ. J. Br. 20, ECF no. 36.) Despite the lack of detail in the briefs regarding the charges against Plaintiff, Plaintiff's testimony is consistent with the allegations of those charges. (Inter-Office Memo. Internal Affairs, 4/3/2017, p. 37-38, ECF 36-7; Strickland Dep. 178-82, ECF no. 36-3.)

Defendants have shown "a legitimate, non-retaliatory reason" for their actions. *Davis*, 389 F. Supp. 2d at 477. Therefore, "the burden shifts back to the plaintiff." *Id.* Plaintiff does not provide evidence that the proffered reason has no basis in fact- he admits in his deposition that he returned to the gas station and obtained the video; he does not dispute that he did not include same in his activity log- instead he argues that another officer should have been charged for failure to complete an activity log for a different event. (Strickland Dep. 178-81, ECF no. 36-3.) He does not provide evidence that the proffered reason did not actually motivate Defendants' conduct, nor that it was insufficient to warrant discipline.

27

Plaintiff cannot (and indeed has not attempted to) overcome Defendants' legitimate non-discriminatory reason for recommending disciplinary actions.

The Court will grant Defendants' motion as to the retaliatory conduct claim and dismiss this claim.

### C. Qualified Immunity, Unlawful Search and Seizure, and Excessive Force

Plaintiff's claims for violation of the Fourth and Fourteenth Amendments, unlawful search and seizure and excessive force, arise under 42 U.S.C. § 1983. Plaintiff claims that Defendants Ballinger, Bliss, Murdock and Schimeck acted under color of law when they unlawfully and unreasonably seized Plaintiff, used excessive force in applying handcuffs and searched Plaintiff's automobile. (Am. Compl. ¶ 52.) He claims that Defendant Craig failed to supervise Defendants to prevent their unconstitutional activity, and that Defendant Craig acting in an official capacity and Defendant COD failed to note and investigate the CORE findings, as well as failed to provide supervision, discipline and training necessary to prevent racial harassment, intimidation and discrimination against Plaintiff. (Am. Compl. ¶ 53, ECF no. 19.)

#### 1. Whether Defendants Used Excessive Force on Plaintiff Under The Reasonable Officer's Theory and Whether Qualified Immunity Bars Litigation Against Defendant Officers

"Qualified immunity is an affirmative defense that extends to government officials performing discretionary functions." *Shehee v. Luttrell*, 199 F.3d 295, 299 (6th Cir. 1999). To determine whether an official is entitled to the defense of qualified immunity, the Court applies a two-part test: "(1) whether the plaintiff has shown a violation of a constitutionally

protected right; and, if so, (2) whether the right was clearly established such that a reasonable official would have understood that this behavior violated that right." *Id.* at 299-300. "For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002) (citations omitted).

### a. Handcuffs

Being free from excessive handcuffing is a clearly established right. *See Rudolph v. Babinec*, No. 18-1901, 2019 WL 4559351, at *5 (6th Cir. September 20, 2019). The Sixth Circuit lays out the three elements necessary to make an excessive handcuffing claim: (1) the plaintiff "complained that the handcuffs were too tight, (2) the officers ignored [his] complaints, and (3) [he] suffered 'some physical injury' from the handcuffing." *Id.* (citing *Miller v. Sanilac County*, 606 F.3d 240, 252 (6th Cir. 2010)). Plaintiff testified that he notified three of the officers that the handcuffs were too tight: Defendant Schimeck, Schimeck's partner, and Defendant Bliss.

Defendants argue that this case in analogous to *Burchett v. Kiefer*, 310 F.3d 937 (6th Cir. 2002). Like the case at bar, the *Burchett* plaintiff raised two Fourth Amendment claims: "that the officers lacked the power to detain" Burchett, and that "in detaining him, the officers used an impermissible level of force." *Id.* at 942. *Burchett* considers the detention of an individual who "approaches a property being searched pursuant to a warrant, pauses at the property line, and flees when the officers instruct him to get down." *Id.* at 944. Ultimately, Burchett was handcuffed and kept handcuffed in a police car for three hours while a search was executed on his brother's house. *Id.* at 939-40. When Burchett's wife

and daughter spoke to him through the car window, "Burchett showed them that his hands were swollen and blue." *Id.* at 941. When the daughter pointed this out to one of the officers, Burchett was told "he would be released if he promised to behave." *Id.* at 941. He agreed and he was let out of the car and released from the handcuffs. *Id.* He alleged the "handcuffs caused swelling, abrasions, and three or four days of missed work." *Id.* at 941.

The *Burchett* court concluded that officers did not use excessive force in handcuffing Burchett. It noted precedents that allow a plaintiff to "get to a jury upon a showing that officers handcuffed the plaintiff excessively and unnecessarily tightly and ignored the plaintiff's pleas that the handcuffs were too tight." *Id.* at 945. Yet the court made the distinction from those cases because the officers in *Burchett* "did not ignore any plea that the handcuffs were too tight." *Id.* at 945.

While there is some question of fact as to how Defendant Schimeck responded to Plaintiff's complaint that the handcuffs hurt, the issue was ultimately addressed: Plaintiff's handcuffs were loosened and locked into place by Schimeck's partner, and they were ultimately removed upon Plaintiff giving notice to Bliss that they were too tight. (Strickland Dep. 129-31, 136, 137-38; ECF no 36-3.) Plaintiff's complaints were not ignored. (Strickland Dep. 138.) The Court finds that handcuffing Plaintiff in these circumstances did not violate his constitutional rights and that such handcuffing was excessive; Plaintiff has not demonstrated an excessive handcuffing claim. The officers did not violate his constitutional rights with respect to the handcuffing.

### b. Seizure

The Fourth Amendment provides the right of the people to be secure against

unreasonable searches and seizures. *See Terry v. Ohio*, 392 U.S. 1, 20 (1968). Yet an officer is allowed to detain an individual briefly "for investigative purposes if the officer has a reasonable suspicion . . . that criminal activity has occurred or is about to occur." *Neal v. Melton*, 453 Fed. Appx. 572, 578 (6th Cir. 2011) (citation omitted). To evaluate the reasonableness of the officers' conduct and the constitutionality of the detention, the Court must consider "the governmental interest which allegedly justifies the intrusion," *Terry*, 392 U.S. at 20-21, and "whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion." *Neal*, 453 Fed. Appx. at 579. Plaintiff argues that "at best" Defendants had a concern for his safety. (Pl.'s Resp. 26.) Defendant Ballinger testified extensively about concern for both Plaintiff, as an individual on the scene who "probably wasn't aware . . . of a possible live hand grenade," and his officers and himself, who had to walk back into a potential "blast-zone." (Ballinger Dep. 16-17, 20:20-23, ECF no. 36-6.) Steps were taken at the scene, including to block off streets, "just in case it was a real grenade." (Schimeck Dep. 15; ECF no. 36-5.) Defendant Bliss described that at a critical incident, when police are being drawn in to the scene to remove an individual, officers are putting their lives at risk because there could be a secondary explosive device or a sniper. (Bliss Dep. 14-17, ECF no. 36-9.) The need to neutralize danger to the officers and members of the public during such a critical incident is a legitimate interest to justify intruding on Plaintiff.

Plaintiff then goes on to argue the facts from his point of view- that because of the fog he could not see Defendants' uniforms and badges, that the officers did not identify themselves, so he did not know the shouted demands were coming from police officers,

and that nothing at the gas station premises suggested that it was a crime scene. (Pl.'s Resp. 26.) In evaluating the reasonableness of a seizure, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry*, 392 U.S. at 21-22.

The facts that are not in dispute show that detention of Plaintiff was reasonable. Plaintiff had driven into an on-going crime scene where officers had already identified a grenade next to a gas pump (a potentially severe crime with serious consequences), Plaintiff had entered the gas station lot despite there being firetrucks and police cars placed to block several surrounding roads, officers directed Plaintiff to "get out" of the area, Plaintiff did not immediately identify himself when he heard the "commotion" of the officers approaching and directing him to "get out", Plaintiff did not leave the scene before Defendant Ballinger entered the scene and removed Plaintiff for his safety and that of the officers, and Plaintiff's car had dark-tinted windows into which officers could not easily see. (Strickland Dep. 113:19, 113:23-24, 115-16; Ballinger Dep. 14-15, 18-19; Schimeck Dep. 19, 24, Bliss Dep. 16.) These are specific facts from which a reasonable officer could deduce that Plaintiff and his presence in the area posed a grave threat to both the officers and Plaintiff himself, and reasonably warranted an intrusion on Plaintiff.

Given the circumstances, a potentially live grenade near a gas station pump, the nature and quality of the seizure was reasonably limited in time and the least intrusive means available for securing the site and protecting both Plaintiff (the public) and the officers on the scene. The Court concludes that there is not a question of fact that the

detention of Plaintiff was reasonable, was not a violation of the Fourth Amendment, and grants Defendants' motion as to the unlawful seizure claim.

### 2. Whether Defendants Searched Plaintiff's Vehicle In Violation of His Fourth Amendment Rights

With respect to the canine entering Plaintiff's vehicle, Defendants in their brief appear to attempt to raise a question of fact as to whether "Murdock or anyone else" actually entered the vehicle but there is no material question of fact that the canine was in Plaintiff's vehicle. (Defs.' Br. Summ J. 27.) Defendant Officer Murdock admits that the dog showed interest in "the one vehicle in the parking lot" and when he opened the door for her to "get a good smell . . . [s]he kind of nosed her way in and jumped inside the vehicle. She did a 360 inside and came back out. So she did not indicate for any explosives inside the vehicle." (Murdock Dep. 15, Defs.' Mot. Summ. J. Ex. 7, ECF no. 36-8.) Plaintiff testified that he saw it on the video footage from the gas station, and that he saw some loose dirt left in his vehicle. (Strickland Dep. 132.)

"A positive indication by a properly trained dog is sufficient to establish probable cause for the presence of a controlled substance. Once probable cause is established a vehicle search is permissible without a warrant under the automobile exception." *Neal*, 453 Fed. Appx. at 581 (citations omitted). Defendant Murdock was assigned to Bomb Squad at the time of this incident and to the best of his knowledge, his dog was trained on black powder and firearms. (Murdock Dep. 17.) Defendant Murdock admits that his dog had "gone by [the vehicle] showing positive – she didn't positive indication (sic) by sitting, she kept going back to the door and showing interest." (Murdock Dep. 15.) The Court finds no issue of material

fact that there was probable cause for the vehicle to be searched. Even if there were not undisputed facts to support probable cause for the search, Defendant Murdock is immune from liability under qualified immunity for the reasons set forth above. The Court will grant Defendants' motion on this claim.

### 3. Whether Plaintiff's Claims Against Chief Craig And Commander Bliss Are Subject To Dismissal

To establish supervisory liability under 42 U.S.C. § 1983 as to Defendants Chief Craig and Commander Bliss[6], Plaintiff must show that a subordinate engaged in unconstitutional conduct, and that a supervisor at least implicitly authorized, approved, or knowingly acquiesced in the conduct. Defendants correctly point out that there is no evidence that either Craig or Bliss encouraged the handcuffing and detention of Plaintiff or the canine search that underlie Plaintiff's claims of excessive force and unlawful search.

"[A] supervisory official's failure to supervise, control or train the offending individual is not actionable unless the supervisor 'either encouraged the specific incident of misconduct or in some other way directly participated in it.'" *McQueen v. Beecher Community Schools*, 433 F.3d 460, 470 (6th Cir. 2006). "At a minimum a plaintiff must show that the [supervisor] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* (citation omitted); *see also Hays v. Jefferson County*, 668 F.2d 869, 872 (6th Cir. 1982) ("The law is clear that liability

---

[6] Plaintiff's allegations of "failure to supervise" in the amended complaint are directed solely at Defendant Craig (Am. Compl. ¶¶ 52, 53), but Defendants address their argument as to both Craig and Bliss– the analysis herein would apply equally to Defendant Commander Bliss, though failure to supervise allegations were not plead as to Bliss.

of supervisory personnel must be based on more than merely the right to control employees. Without more, such a theory would allow liability on a respondeat superior basis-a basis expressly rejected by the Supreme Court . . . ." ). "These principles make clear that a prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor." *Id.*

As discussed above, in the context of the handcuffing, search and the seizure, there is no unconstitutional conduct by the officers on the scene. Without evidence to raise a genuine issue of material fact that one of the officers violated Plaintiff's Fourth or Fourteenth amendment rights, the Court can dismiss the section 1983 claims against Craig (and Bliss) related to same. Yet Plaintiff wants to paint this claim against Defendants Craig with a broader brush, pointing to a "pattern of past misconduct", and "the harassment of black officers by white officers that Chief James Craig purposely ignored even when presented with the CORE Reports' findings." (Defs.' Mot. Summ. J. 23-24.) Plaintiff neither identifies nor alleges other Fourth or Fourteenth amendment violations by white officers against black officers, and no evidence that supervisors so much as implicitly authorized, approved or acquiesced in the January 22 violations alleged herein. For these reasons the Court dismisses the 42 U.S.C. § 1983 claims as to Defendant Craig (and, were it plead, Defendant Commander Bliss).

### 4. Whether A Genuine Issue Of Fact Exists With Respect To Plaintiff's § 1983 Claim Against The City of Detroit

Plaintiff claims a cause of action for Defendant City of Detroit's "creating, tolerating and encouraging a custom, policy and practice of unlawful discrimination based on race

which was the moving force resulting in the violation of Plaintiff's civil and constitutional rights," failing to "provide the supervision, discipline and training necessary to prevent such racial harassment, intimidation and discrimination against Plaintiff," and failing "to note and investigate credible findings by the CORE committee of racial harassment, intimidation and discrimination in the police department." (Am. Compl. ¶ 53, ECF no. 19.) Plaintiff couches its claim as "a failure 'to provide adequate training in light of foreseeable consequences that could result from the lack of instruction.'" (Pl.'s Resp. 28, citing *Kulpa for Estate of Kulpa v. Cantea*, 708 Fed. Appx. 846, 856 (6th Cir. Sept. 2017)).

"[A] municipality cannot be made liable by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986) (citing *Monell v. Dept. Of Social Services of City of New York*, 436 U.S. 658, 691 (1978)). "[R]ecovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." *Id.* at 480. Municipal liability also attaches "where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 481.

> [I]n order to impose liability on a local governmental entity for failing to act to preserve constitutional rights, a § 1983 plaintiff must establish not only that he was deprived of a constitutional right, but that: (1) the municipality had a policy; (2) the policy "amounts to deliberate indifference" to the plaintiff's constitutional right; and (3) the policy is the "moving force behind the constitutional violation."

*Torres v. Allentown Police Dept.*, 2014 WL 4081477, at *4 (E.D. Pa. Aug. 18, 2014) *(citing City of Canton, Ohio v. Harris*, 489 U.S. 378, 389-91 (1989)). With respect to Plaintiff's section 1983 claim against Defendant City of Detroit, Plaintiff has provided no evidence that the City of Detroit has a policy, custom or procedure that caused the alleged violation of

Plaintiff's Fourth Amendment Rights. Plaintiff relies on the overlay of the allegation of a widespread practice of harassing and abusing black officers as part of a broad custom, implied policy and practice that would ultimately result in white officers abusing their search and seizure authority as they did against Plaintiff. Plaintiff argues that the "factual validity" of this claim can only be established by an evidentiary hearing. (Pl.'s Resp. 28, ECF no. 39.) Yet he offers no evidence of a training or other inadequacy that was the "moving force" behind those actions underlying his Fourth and Fourteenth Amendment claims. *See Monell*, 436 U.S. at 694. The Court also notes that, as in *Kulpa*, Plaintiff provided "no evidence of repeated complaints regarding similar constitutional violations." *Kulpa*, 708 Fed. Appx. at 856.

The Court will grant Defendants' motion to dismiss as to the section 1983 claim against Defendant City of Detroit.

### D. Violation Of Civil Rights Under 42 U.S.C. § 1981

"The rights protected by . . . section [1981] are protected against impairment by nongovernmental discrimination and impairment under color of State law." *Grinter v. Knight*, 532 F.3d 567, 576 (6th Cir. 2008). Plaintiff's amended complaint does not identify against which Defendants he makes this claim, nor does his response brief. In his response, Plaintiff argues only about maintaining an action "against government" and the "right to maintain a § 1981 action against the state." The Court will address Plaintiff's claim accordingly.

Defendants argue that this cause of action does not extend to municipalities. *See Arendale v. City of Memphis*, 519 F.3d 587, 594 (6th Cir. 2008). "In *Jett v. Dallas Indep.*

*Sch. Dist.*, 491 U.S. 701 (1989), . . . the Supreme Court held that § 1981's implicit cause of action does not extend to suits brought against state actors." *Id.* at 594 (internal citations omitted); *see also Grinter*, 532 F.3d at 577 (". . . [section] 1983 provides an exclusive remedy for violations against state actors sued in their official capacities. An official capacity lawsuit against . . . a state actor, for constitutional violations, such as race discrimination, cannot be brought under § 1981."); and *McCormick v. Miami University*, 693 F.3d 654, 661 (2012) (6th Cir. 2012) ("[W]e conclude that § 1983 is the exclusive mechanism to vindicate violations of § 1981 by an individual state actor acting in his individual capacity.").

Plaintiff suggests that there is a circuit split on the issue and relies on and invites the Court to follow the Ninth Circuit on this issue. *E.g., Federation of African American Contractors v. City of Oakland*, 96 F.3d 1204 (9th Cir. 1996) ("We hold that the Civil Rights Act of 1991 creates an implied cause of action against state actors under 42 U.S.C. § 1981, and thus statutorily overrules *Jett's* holding that 42 U.S.C. § 1983 provides the exclusive federal remedy against municipalities for violation of the civil rights guaranteed by 42 U.S.C. § 1981.") The Court follows Sixth Circuit authority on this issue, which continues "to hold that *Jett* remains binding authority and that 'the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units.'" *McCormick*, 693 F.3d at 660. The Court will grant Defendants' motion for summary judgment as to Plaintiff's fourth claim.

## IV. Conclusion

For the reasons stated herein and on the record, the Court grants Defendants' motion

for summary judgment.

So ordered.

s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  November 5, 2019

I hereby certify that a copy of the foregoing document was served upon counsel of record and Plaintiff on November 5, 2019, by electronic and/or ordinary mail.

s/Lisa Bartlett
Case Manager